**Eileen P. GRENELL, Petitioner**

v.

**STATE CIVIL SERVICE COMMIS-SION (FRANKLIN COUNTY and Franklin/Fulton County Drug and Alcohol Abuse Unit), Respondents.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Feb. 2, 2007.

Decided April 18, 2007.

Reconsideration Denied June 15, 2007.

---

Jennifer A. Nachamkin, Harrisburg, for petitioner.

Alex Snyder, York, for respondents.

BEFORE: COLINS, Judge, SIMPSON, Judge, and KELLEY, Senior Judge.

OPINION BY Judge COLINS.

Eileen Grenell petitions for review of an order of the Pennsylvania State Civil Service Commission (Commission) that sustained Grenell's dismissal by her former employer, the Franklin/Fulton County Drug and Alcohol Abuse Unit (Employer). The Commission concluded that Employer had established that it had just cause for removing Grenell as Drug and Alcohol Prevention Program Supervisor (Tobacco) (Local Government), but that Employer had failed to provide due process such as to effectuate the removal as of the date of termination through the date of her post-termination hearing. Accordingly, the Commission directed Employer to reimburse Grenell for wages and emoluments from July 12, 2005 through September 27, 2005.

The pertinent facts, based upon those found by the Commission, are as follows. Although Grenell began working for Franklin County in 1982 as a Drug and Alcohol Prevention Specialist, in 2002, she applied for and the County appointed her to the position of Drug and Alcohol Pre-

vention Program Supervisor (Tobacco).[1] The primary responsibility of the person holding this position is to "direct and coordinate the tobacco projects which included, without limitation, oversight of all the tobacco related programs pursuant to the" contract (Contract) between the County and the Department. Finding of Fact No. 12. Under the terms of the Contract, the County would develop projects aimed at discouraging the use of tobacco, and the Department would reimburse the County for appropriate and proper costs upon the County's submission of invoices to the Department. In accordance with the provisions of the Contract with the Department, the County entered into a subcontract with Pennsylvania State University (Penn State), pursuant to which, Penn State acted as a service provider to implement anti-tobacco programs.

The Commission determined that Grenell was the County person solely responsible for making determinations as to whether program expenditures were allowed under the Contract and whether Contract-related program purchases were appropriate under the terms of the Contract. In this regard the Department provided Grenell with training sessions that informed attendees regarding the County's responsibilities under the Contact, fiscal organization, directions regarding a County's use of Department-generated promotional items and reports to the Department regarding the details of such use, permissible expenditures, and use of remaining funds at the end of the fiscal year.

The Commission determined that, although Grenell was not responsible to process invoices to be sent to the Department, she had ultimate responsibility to ensure that invoices were sent to the Department in a timely fashion. However, for the fiscal years 2002 through 2003, the County submitted no invoices to the Department. The Commission also determined that Grenell had failed her fiscal-related responsibilities by purchasing items or services the reimbursement for which she should have known the Department would not approve. Specifically, the Commission determined that Grenell had purchased various pieces of electronic equipment in an effort to spend down allotted program money. Grenell purchased $52,264.40 in "promotional items, such as DVDs, boom boxes, cameras, home theatre system, camcorders, etc.," Finding of Fact 102, for which the Department declined to reimburse the County.

Additionally, Grenell engaged an acquaintance, Scott Brown, to organize a tobacco-related program. He billed the County for items he purchased for the program, but did not detail how the items related to the anti-tobacco program. Because the invoices the County submitted did not disclose such relationship, the Department refused to reimburse the County for the items. Ultimately, Mr. Brown returned the $17,000 of the funds used for the items that were not subject to Department reimbursement.

Grenell also arranged to participate with Brown in the "Salvador Concert." Brown submitted a $30,500 invoice to the County for the Concert which included some items designated as being for promotions and prizes. Although Grenell had submitted an initial invoice, she had the County's fiscal officer submit a second bill that in-

---

1. The County created this position following an award from the Pennsylvania Department of Health, as a result of the Commonwealth's settlement of claims in the Tobacco Master Settlement Agreement, in accordance with the implementing contract between the Department and the County, by the terms of which the County was required to develop a "comprehensive tobacco control program" for the Department within the County.

cluded advertising expenses, but which did not indicate that the bill was for advertising, so that the Department would not reject any part of the bill.

The Department also determined that Grenell, in violation of County policy had engaged in outside employment without first submitting a written request. Grenell worked for Penn State as well as the County, and in fact, she reported to a Penn State employee who Grenell directed under the anti-smoking program contract between the County and Penn State.

Additionally, the Commission found that Grenell had allowed an acquaintance of hers, Jerome Kater, to perform compliance checks[2] without first having obtained the proper appointment authority for Kater to act in an enforcement capacity. Grenell met with County District Attorney, Jack Nelson, to try to get him to appoint Kater as a special county detective with enforcement authority. However, before Nelson affirmatively acted on that request, Grenell had Kater, wearing a uniform and carrying a badge, conduct compliance checks, without issuing citations. Although Kater did not issue citations, Kater entered a contract with the County to serve as a consultant and was compensated pursuant to that contract at the rate of $25.00 per site check.

The County also asserted as a basis for termination that Grenell had hired minors to participate in the compliance checks, and permitted them to work late hours in violation of child labor laws. The minors would enter stores and try to purchase cigarettes. The Commission noted that, on June 5, 2003, youths were involved in conducting thirty compliance checks that began at 6:45 p.m. and ended at 11:36 p.m. Minors would start work early in the morning and sometimes work as late as 10:00 p.m. Grenell also hired an eight-year old child, Annalise Rininger——the daughter of a friend——to work on March 10, 2003. Rininger assisted in setting up an information table and explained anti-tobacco literature to persons asking questions. The County paid Rininger $10.00 per hour and she submitted a Federal W–9 tax form to the County.

In April, 2004, the County's solicitor initiated an investigation and directed the County's MIS Director to retrieve from any County computer, including Grenell's, all documents, e-mails, correspondence and information written by Grenell. Following this action, and the completion of work by a forensic computer company, the County placed Grenell on administrative leave, pending the completion of the County's investigation. An audit indicated that Grenell had possibly committed thirty-three policy violations.

Although the County's Director of Human Resources met with Grenell and informed her that, if he decided to recommend that the County Board of Commissioners remove her, a hearing would be held first, when he did recommend to the Board that it remove Grenell, he only notified her by letter that the Board would meet on July 12, 2005, to consider her employment status. At a Board meeting on July 5, the Board voted to terminate Grenell, concluding that Grenell had (1) violated the County's outside employment policy and contractor integrity provisions of the Contract for accepting employment with Penn State and falsifying documents relating to that employment; (2) failed to meet the Contract's compliance check

**2.** Compliance checks involve sending an underage person into a store with the purported purpose of purchasing cigarettes. When a store sells cigarettes to an underage person, the compliance officer can issue warnings and citations to the store.

requirements by failing to obtain enforcement authority and failing to follow Department procedures regarding compliance checks; (3) improperly held out an unqualified individual as an authorized compliance check enforcement representative, thus exposing the County to potential liability; (4) violated child labor laws by hiring children under fifteen years of age; (5) violated County policies and the County Code, and the Contract provisions by failing to use a competitive bidding process and by submitting misleading invoices for payment; and (6) failed to perform her job properly with regard to (a) the manner in which she monitored subcontracts, (b) obtaining enforcement authority to issue citations, (c) purchases and use of tobacco prevention funds, and (d) monitoring of expenditure of grant funds.

Grenell appealed that action to the Commission, which concluded that the County had just cause for removing Grenell from her position, and this petition for review followed. Grenell raises the following issues for our review: (1) Whether the Commission erred as a matter of law or capriciously disregarded the terms of the Contract, the agreement between Penn State and the County, and other evidence, in concluding that Grenell had responsibility for the program's fiscal compliance; (2) Whether the Commission erred in its conclusion that Grenell's actions with regard to the employment of minors constituted violations of the child labor laws; and (3) Whether the Commission erred in concluding that Grenell's secondary employment by Penn State supported the termination.

### *Capricious Disregard Standard*

In advancing her arguments, Grenell relies upon the seminal case of *Leon E. Wintermyer, Inc. v. Workers' Compensation Appeal Board (Marlowe)*, 571 Pa. 189, 812 A.2d 478 (2002), and two decisions of this Court that considered whether the adjudicators below had violated the capricious disregard standard, *Frog, Switch & Manufacturing Co. v. Pennsylvania Human Relations Commission*, 885 A.2d 655 (Pa.Cmwlth.2005) and *Hinkle v. City of Philadelphia, Board of Pensions and Retirement*, 881 A.2d 22 (Pa.Cmwlth.2005).

In *Wintermyer*, the Supreme Court stated that capricious disregard is a proper element of appellate review whenever a party has raised the issue, but that when substantial evidence supports the agency's factual determination, capricious disregard will warrant reversal only in rare circumstances. 571 Pa. at 203, 812 A.2d at 487, text and n. 14.

■ As Grenell notes, this Court may conclude that an adjudicator has capriciously disregarded competent evidence when the unsuccessful party below has presented "overwhelming evidence" upon which the adjudicator could have reached a contrary conclusion, and the adjudicator has not satisfactorily addressed that evidence by resolving conflicts in the evidence or making credibility determinations that are essential with regard to the evidence. *Frog, Switch & Manufacturing Co.*, 885 A.2d at 667, citing *Wintermyer*.

■ In other words, where there is strong "critical" evidence that contradicts evidence supporting a contrary determination, the adjudicator must provide an explanation as to how it made its determination. The ultimate question is whether an adjudicator "has failed to give a proper explanation of overwhelming critical evidence." *Id.* However, in *Frog, Switch & Manufacturing Co.*, the Court recognized the extremely unusual nature of the adjudicator's decision, in which "each and every key finding of causation, [the Human Relations Commission] ignored evidence

that would have compelled a different conclusion." *Id.*

### *Fiscal Administration Issues*

■ Grenell first asserts that the Commission erred as a matter of law by capriciously disregarding evidence that Grenell did not have a duty or responsibility with regard to fiscal matters. Grenell argues that the terms of the Contract between the County and the Department do not mention Grenell or her job title. Grenell also asserts that she was not named in or a party to the contract between the County and Penn State in its capacity as a program operator for the County. Further, Grenell points out that the terms of the Penn State contract directed Penn State to submit invoices directly to Paula Dean, who worked in the County's fiscal department. Additionally, Grenell relies upon the fact that the County submitted into evidence an unsigned job description for Grenell's position. The job description does not include fiscal responsibilities other than budgeting. Based upon these factors, Grenell asserts that the Commission capriciously disregarded evidence supporting her position that she had no fiscal responsibilities.

However, we cannot agree with Grenell that these circumstances represent overwhelming evidence that supports a contrary finding that Grenell did not have fiscal responsibility. The absence of Grenell's name from the Contract or the Penn State subcontract does not definitively support her version of the facts. The record contains ample evidence supporting the Commission's determinations and conclusions. We begin by noting that Grenell submitted a job proposal she wrote that included the following language:

> Manage programming for county tobacco prevention/control grant award from PDOH; including best practices from CDC, contracts with service providers/individuals for performance of services, **fiscal interfacing,** web-based reporting system, write grant(s) as offered by PDOH/DTPC; interviewing ... for contract/hire; reporting, including written inventory/equipment; train/supervisor.

(Emphasis added.)

This job proposal specifically lists fiscal interfacing as part of the job. Although the description does not define the phrase, there is a quantity of testimony from Grenell herself, as well as others, including Judy Ochs of the Department of Health, that belies her position here that she did not believe she had fiscal responsibilities. For example, as will be discussed below, Grenell discussed the contents of at least one invoice with Paula Dean, suggesting that Dean submit an invoice without any reference to advertising, so that the invoice would be paid in its entirety. Finding of Fact No. 117. Her testimony in this regard supports the inference that she knew her responsibilities included oversight of fiscal matters relating to the tobacco program. Further, there is testimony in the record indicating that she contacted Judy Ochs in the Department of Health regarding costs that the program could recoup from the Department.

Nor do we find persuasive her argument that responsibility rested with her superiors based upon their job descriptions. Although that evidence may support the conclusion that they had such responsibilities, the record evidence indicates that, with regard to the discrete tobacco program, Grenell's superiors reasonably relied upon her supervision of the fiscal matters, based upon the training programs she attended that informed her about appropriate expenditures and the means to obtain repayment for program expenses. Grenell places great emphasis on the fact that

Paula Dean was responsible for processing invoices; however, the Commission's decision is not based solely on the fact that Grenell did not check to ensure that Dean was processing the invoices. Rather, the significant charges concerned Grenell's failure to use competitive bidding required under the Contract and the submission of misleading invoices for payment, as discussed below.

The record is replete with evidence concerning Grenell's training with regard to recoverable costs, as well as program content. In light of this evidence we cannot agree with Grenell that there is overwhelming evidence that she did not have responsibility for fiscal matters. Rather, we believe the Commission properly sifted through the evidence and did not err in its conclusion regarding Grenell's fiscal responsibilities. We address below the specific charges.

### a. Competitive Bidding

■ The Commission concluded that the County had sustained its charge that Grenell had failed to use a competitive bidding process in pricing items to be used for a proposal involving the Chambersburg YMCA. As the Commission noted, although Grenell asserted that she did not know she needed to use a bidding process, the Contract specifically required the County to use a bidding process in the performance of the Contract. As program supervisor, the Commission reasonably concluded that Grenell should have known that she was required to comply with the competitive bidding process.

### b. Invoice Issues

With regard to her fiscal responsibilities, the Commission noted that Grenell: (1) attended training sessions regarding allowable programs, allowable expenses, and expected protocol; (2) attended technical assistance conferences providing information on contract requirements; (3) attended technical assistance conferences concerning fiscal organization, methods to obtain promotional items, permissible expenditures, and the method by which to spend down assets remaining at the end of the fiscal year; (4) reported to County Administrators and provided them with monthly reports; (5) was required to coordinate programs through Penn State, and that invoices for Penn State's work were submitted to the County's fiscal department for payment, reimbursement of which depended upon the County's proper submission of the invoices to the Department of Health.

### 1. Spending Down Program Money

The Commission determined that the Contract included specific provisions regarding the invoice process the Program should employ to obtain reimbursement for expenditures. The Contract indicates that the Department could disapprove reimbursement when the expenditure is not allowed under the terms of the Contract. The County's fiscal department notified Grenell that she should spend down money to which the County was still entitled under the Contract. Despite receiving information from the Department reinforcing the notion that the County was required to link purchases of promotional items with specific Program initiatives, Grenell, in seeking to spend down the money under the authority of the fiscal department, proceeded to spend thousands of dollars for electronic equipment. The Department declined to reimburse the County for these items.

■ The Commission made credibility determinations concerning the training Grenell received with regard to the purchase of promotional items. Grenell had ultimate responsibility to make reasoned

purchasing decisions notwithstanding the contrary direction of her fiscal department. The training the Department provided clearly forewarned Grenell that the County could not be reimbursed for certain promotional items. She attended training programs that describe proper spending procedures under the Contract. Accordingly, we conclude that the Commission did not err in concluding that Grenell failed to comply with the procedures for purchasing and invoicing.

### 2. Safe Summer

The Commission determined that Grenell had violated the terms of the Contract by committing the County to be a co-sponsor of a "Safe Summer" program. Penn State employed the organizer, Scott Brown, to work on tobacco-related initiatives including community programming and school programming. However, Brown also owned a business called Joyful Noise Productions, which entered a contract with the County to provide anti-tobacco programming, one of which was the Safe Summer Program intended to target area youths with the aim of discouraging both alcohol and tobacco use. Brown made purchases of various items such as tickets, movie passes, t-shirts, banners, and postage and billed the County $17,000 for these purchases, but did not include information on the invoices as to how the purchases related to tobacco use prevention such as would allow reimbursement from the Department to the County under the Program. Grenell recognized that this failure of Brown to indicate the relationship of the purchases to the tobacco prevention Program meant that she would have difficulty recouping the money from the Department. Grenell, in her capacity as an employee of Penn State reported Brown's expenditures to her Penn State Supervisor. Ultimately Brown returned $17,000 of the Safe Summer money to Penn State. The Department informed Grenell's supervisor, Jim Rodgers, that it would not reimburse the County for Safe Summer Program expenditures.

Although the County ultimately was not responsible for the $17,000 billing, the Commission noted that Grenell never communicated with her two superiors regarding the nature of Brown's misconduct, and concluded simply that Grenell did not handle Brown's misconduct well. The Commission ultimately decided that, although Grenell's handling of the Safe Summer problem would not alone have been enough to conclude that the County had just cause to terminate her, the totality of Grenell's failure to monitor adequately expenditures under the Contract did establish just cause.

### 3. Salvador Concert

Brown also organized a concert called the Salvador Concert and entered a contract with the County for the concert. Brown submitted an invoice to the County in the amount of $30,500, which included $3,500 for "Promotions" and $5,000 for "Prizes, Misc. Product, Program Supplies (for future events)." Grenell submitted two invoices to the County's fiscal employee, Paula Dean. Grenell told Dean that she had already submitted an invoice that included advertising costs to the Department, but that the County had not been reimbursed. Grenell directed the resubmission of an invoice that contained those costs, but did not refer to advertising so that the Department would not reject the invoice. The County did get reimbursed for these costs, but the Commission agreed with the County that this was further illustrative of Grenell's alleged failure to supervise Brown's submission of expenses that were not specifically authorized under the Contract with the Department.

In summary, the Commission concluded that, although the Safe Summer and Salvador Concert invoicing matters would not alone support the conclusion that the County had just cause to dismiss Grenell, the totality of the circumstances involving Grenell's oversight of fiscal issues, for which the Department had provided training, provided the County with just cause for dismissal.

### Allowing Kater to Perform Compliance Checks

■ Grenell asserts that the Commission erred in concluding that Kater did not have proper enforcement authority. Grenell asserts that Kater did not need the authorization of the District Attorney in order to be authorized to perform compliance checks. Grenell asserts that, because the Tobacco Settlement Act includes a provision vesting primary contractors with the authority to institute proceedings to enforce the Act according to any means permitted by the Rules of Criminal Procedure, Kater was accordingly authorized to perform compliance checks notwithstanding Grenell's failure to obtain specific authorization from the District Attorney. We agree with the Commission's conclusion that the Kater had no authorization to perform compliance checks.

As the County notes, both the County's contract with the Department and the Tobacco Act indicate that, in pursuing its duty to enforce the Act, the County was required to work with local law enforcement authorities. The Act states that contractors such as the County must consult with the local enforcement agency in the municipality. Grenell's own testimony indicates that she understood that she was required to obtain the approval of the District Attorney to have Kater officially appointed as a special detective; however, rather than follow the directive of the District Attorney to obtain approval by the district magistrates, Grenell indicated to the district magistrates that the District Attorney had already appointed Kater to be a special detective for compliance checks. The record clearly shows that Grenell directed Kater to perform the checks notwithstanding the fact that he never obtained the jurisdictional authority to do so. We reject Grenell's argument that the simple fact that Kater entered into a contract with the County was sufficient to vest him with the law enforcement authority to perform the duties of an enforcement officer, even though he only issued warnings and not citations for noncompliance with the Act. Further, there is evidence in the record that indicates that Grenell authorized Kater to perform checks even before he entered into a contract with the County. Contrary to Grenell's position there is no overwhelming evidence that could support a contrary conclusion on this issue. The record contains substantial evidence to support the Commission's factual determinations regarding Grenell's use of Kater to perform compliance checks.

### Violation of Child Labor Laws

■ The Commission noted that Grenell admitted that, when she conducted compliance checks using youths, the checks required the youths to work sometimes past 10:00 p.m. The compliance check forms included in the record indicate that one day these checks indeed ran past 10:00 p.m. The Board noted that child labor laws prohibit the employment of children under the age of eighteen to work past 7:00 p.m. during the school year and 10:00 p.m. from June through Labor Day.[3] The

---

3. Section 4 of the Child Labor Law, Act of May 13, 1915, P.L. 286, *as amended*, 43 P.S.

evidence clearly supports the Commission's conclusion that Grenell, the person responsible for hiring the youths and supervising their employment, disregarded the law. Grenell asserts that her job description did not place the responsibility for knowing the terms of child labor laws upon her. However, we agree with the Commission's conclusion that, as the supervisor of the program, Grenell had the ultimate responsibility to know and apply the employment laws.

Grenell argues that the child labor laws do not apply to counties, because the law defines the term "persons" to mean only municipalities. However, counties, as well as townships, cities, and boroughs, are municipalities. Further, contrary to Grenell's assertion that the child labor laws do not apply to "casual service," we agree with the Commission that Grenell, as supervisor, did authorize the youths' employment, albeit on a location-by-location basis. We also reject Grenell's attempt to discredit the significance of the Commission's determination that the youths worked past 10:00 p.m. during vacation, based upon her assertion that she did not personally supervise the youths on that occasion. However, as supervisor she reasonably had a duty to ensure that the County was not in violation of the law during these times.

As to Grenell's use of an eight-year old, she asserts that the child was not really "employed" by the County. However, despite caselaw to which she cites for the proposition that the simple receipt of a paycheck is insufficient to establish an employment relationship, in this case there is sufficient evidence regarding not only pay, but the work the eight-year old performed (setting up a literature table, attending to the table, and explaining tobacco-related information to persons with questions) to

support the conclusion that the County employed the child.

The General Assembly has placed restrictions on the employment of minors. *See* the Act commonly referred to as the Child Labor Law (Law), 43 P.S. §§ 41–71. The Law does indeed appear to permit eight-year old children to be employed with certain limitations. However, people seeking to employ such children are required to comply with certain provisions of the Law, depending on the work the child seeks to perform. For example, an employer may hire a child to serve as a product model; however, the employer or child must first obtain a permit from the Department of Labor and Industry. Section 7.1 of the Law, 43 P.S. § 48.1, added by the Act of August 23, 1961. More recently, the General Assembly addressed the issue of "youth peddling." However, even with regard to that subject, persons employing such children must obtain a signed consent from a parent or guardian. Section 5.2 of the Law, 43 P.S. § 44.2, added by the Act of December 9, 2002. These provisions support the Commission's conclusion that Grenell did not satisfy the terms of the Child Labor Law in her hiring and use of an eight-year old minor.

The Commission noted Grenell's testimony that she had questioned a County solicitor, Beth Gabler, regarding the hiring or use of children; however, Gabler testified that Grenell did not request advice regarding the issue. The Commission indicated that it accepted Gabler's testimony that she did not receive a question regarding child labor from Grenell and did not offer advice to Grenell regarding the hiring of children.

Based upon the foregoing reasons, we conclude that the Commission did not err in concluding that Grenell had engaged

§ 46.

children who worked in violation of the child labor laws.

### Outside Employment

█ The Commission concluded that Grenell violated the County's policy prohibiting outside employment and Program contract provisions. The County requires employees who seek to obtain outside employment to submit a written request for approval to the County before accepting outside employment. Grenell signed a form acknowledging that she received the policy. The Program contract precludes the County from having a financial interest in any Program contractor. Grenell worked for Penn State, a Program contractor, while she was performing her job as Program supervisor. The Contract defined the term "financial interest" to include employment. Thus, there are two aspects to Grenell's outside employment: (1) violation of the County's policy against outside employment and (2) violation of conflict of interest provisions in the contract between the County and the Department.

Grenell asserts that the Commission capriciously disregarded evidence that her employment with Penn State predated her employment with the Program. However, we believe that the timing of her employment with Penn State and as the supervisor of the Program is not determinative. Grenell admitted that she worked for both employers at the same time. The record does reveal a conflict in the testimony as to whether Grenell orally requested permission. Grenell testified that she received oral permission from her two superiors, Jim Rodgers and Kelly Goshen; however, they both denied providing her with permission. The Commission determined that Grenell did not substantiate her testimony that she complied with the County's policy with any documented per-

mission to work for Penn State. The evidence, rather than being overwhelming in nature to support her position, supports the County's position. Two County employees stated that she never approached them regarding the employment, and there is no documentary evidence to suggest she ever requested permission in writing, as required by the policy.

As to the question of the conflict created by dual employment in violation of the contract provisions, although we recognize that the conflict of interest provisions are aimed largely at preventing pecuniary fraud, i.e., compensating a contractor in whom the government agent has a financial interest, the literal language of the contract clearly prohibits the "Contractor" (the County) from having a financial interest in any other contractor. Because Grenell made contracting decisions, her employment with Penn State did create a conflict of interest. She was paid by a contractor the County and Department paid through the Program, and Grenell correspondingly was responsible for the continued use of Penn State as a contractor for the program.

Accordingly, we conclude that the Commission did not err with regard to Grenell's violation of the County's policy and the Contract prohibitions against the creation of a conflict of interest.

Based upon the foregoing, we reject Grenell's argument that the Commission capriciously disregarded evidence or erred as a matter of law. We affirm the Commission's decision.

### ORDER

AND NOW, this 18th day of April 2007 the order of the State Civil Service Commission is affirmed.